**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


**THE UNITED STATES OF AMERICA,**

    **Plaintiff,**

**vs.**            **Cr. No.  15-2226 JCH**

**BETHZABETH GUADALUPE**
**CASTRO-GALLEGOS,**

    **Defendant.**


**MEMORANDUM OPINION AND ORDER**

   This matter is before the Court on the *Motion to Suppress Evidence* [Doc. 26] by Defendant Bethzabeth Guadalupe Castro-Gallegos ("Castro-Gallegos"). The primary issues presented in the motion are whether Defendant consented to the search of her bag, and if so, whether such consent was voluntarily given. On December 15, 2015, the Court held an evidentiary hearing on the motion, at which Defendant was present and represented by counsel. Defendant also utilized the services of a Spanish-language interpreter at the hearing. After reviewing the briefs filed by the parties and evidence presented at the hearing, the Court concludes that while her encounter with the DEA Agent was consensual, Defendant did not provide him with unequivocal consent to search her bag, and the motion to suppress should be granted.

**FINDINGS OF FACT**

   On June 9, 2015, Castro-Gallegos was a passenger on the eastbound Amtrak train heading east from Flagstaff, Arizona, toward Chicago. Transcript of Hearing Held Dec. 15, 2015 ("Tr.") at 5, 12. Drug Enforcement Administration (DEA) Special Agent Jarrell Perry boarded

the train where it was stopped at the station in Albuquerque in order to find narcotics and other illegal items. An experienced agent, Perry had obtained in advance the passenger name record (PNR) for a specific passenger known as Diana Sanchez. *Id*. at 7; Govt. Ex. 8. The PNR showed that on the evening of June 7, 2015, someone using the name "Diana Sanchez," had reserved a coach ticket for one-way travel from Phoenix, Arizona at 11:30 p.m. on June 8 and arriving in Indianapolis, Indiana at 11:50 p.m. on June 10. Tr. at 7-9, 12-15, 34-35; Govt. Ex. 8. The PNR contains no information as to the race of the passenger. Tr. at 10, 16-18, 33; Govt. Ex. 8. However, Perry is aware that Phoenix is a source city for narcotics, and Indianapolis is a destination city for narcotics. Tr. at 9. According to the PNR, Diana Sanchez was traveling from Phoenix to Flagstaff by Greyhound bus.[1] Tr. at 15; Govt. Ex. 8. The PNR also showed that the $225 train ticket was paid for in cash at the Flagstaff station at 3:41 a.m. on June 9, just an hour before the train was to depart that city. Tr. at 9, 13; Govt. Ex. 8. The last-minute nature of the reservation and cash purchase of the ticket, the one-way travel, the city of origin, and the destination city all were consistent, in Perry's experience, with the transport of illegal narcotics. Tr. at 8-10. Perry testified credibly that individuals carrying contraband often use false identities, and are able to do so because Greyhound and Amtrak do not require passengers to provide identification. Tr. at 6, 10, 16-18. Therefore the person traveling under the ticket for "Diana Sanchez" might be someone else entirely, and may not even be female.

Perry went to the Albuquerque train station looking for the person traveling under the name Diana Sanchez in one of the coach cars. Tr. at 18-19, 35-36. In that vein, Perry was interested in talking to passengers in coach with a slip above their seat indicating that they were bound for Chicago. Tr. at 38-40, 44-45, 55. Once onboard the coach section of the train, Perry

---

[1] The train traveled to Chicago, at which point "Diana Sanchez" would have to transfer to another train or a bus in order to reach Indianapolis. Tr. at 13; Ex. 8.

encountered Castro-Gallegos, who had a tag above her seat with "CHI" written on it, indicating that she was traveling on that train to Chicago. *Id.* Perry audio-recorded his interaction with her. Govt. Ex. 1. Perry greeted Castro-Gallegos, identified himself as a police officer, and asked for permission to speak to her. Govt. Ex. 1. Castro-Gallegos said yes, and Perry stood in front of the seat directly in front of her seat, such that Castro-Gallegos was not blocked from standing up and walking away. Tr. at 22, 48; Govt. Ex. 10. Perry asked her if she had her train ticket with her. Govt. Ex. 1. She said "yeah," and handed Perry the ticket, which he reviewed and returned to her later in the encounter. Govt. Ex. 1. The ticket bore the name Diana Sanchez. *Id.*; Tr. at 40. Next, Perry asked Defendant how her trip was going. Govt. Ex. 1. She responded, "Um, good . . . tired." *Id.* Perry asked Castro-Gallegos, "Where you headed to, ma'am?" and she responded, "Chicago." *Id.* Then, Perry asked where she was coming from, and Castro-Gallegos responded, "Phoenix." *Id.* Perry asked Castro-Gallegos, "What takes you to Chicago?" *Id.* Castro-Gallegos said that her aunt "barely, barely got a heart attack" and indicated that she was going to Chicago to help her. *Id.* Perry then asked if Castro-Gallegos had identification with her, and she said yes. *Id.* Defendant showed Perry ID in the name of "Diana Sanchez." After he reviewed it, Perry returned the ID to Defendant. Tr. at 54; Govt. Ex. 1 ("Okay, 7681. Okay, Diana Sanchez. Thank you.").

In the meantime, after requesting to see her identification Perry continued to ask Castro-Gallegos questions about the duration of her visit to Chicago, her family, where she lived in Phoenix, how she would return home to Phoenix, and whether she liked the train. Govt. Ex. 1. At all times, Perry's tone remained calm, friendly, and non-threatening. *Id.* Perry said, "Well, just to let you know why I'm speaking to you, ma'am. We just check this train here for security reasons. Did you board the train in Flagstaff, probably?" *Id.* Castro-Gallegos agreed and said that she had

taken a bus from Phoenix to Flagstaff. *Id*. After a brief exchange about the last-minute nature of Castro-Gallegos' trip, Perry again explains that he was talking to Castro-Gallegos and other passengers "just for security on the train because sometimes due to the lack of security when you boarded in Flagstaff, you probably realized there wasn't a lot of security on the train." *Id*.

After telling Castro-Gallegos that "sometimes we got a problem with people carrying contraband on the train," *id*., Perry asked, "Do you have luggage on the train with you, ma'am?" *Id*.  Castro-Gallegos replied, "Um, yeah, small one." *Id*. Perry asked where it was located, and Castro-Gallegos indicated that the bag—a brown duffel-style bag with a zipper and two handles—was at her feet. *Id*.; Tr. at 22, 50; Govt. Exs. 2-3, 9. Castro-Gallegos denied having any other luggage overhead or in the downstairs luggage compartment. Govt. Ex. 1. Perry asked if Castro-Gallegos had anything illegal inside the bag, and she said no. *Id*. Perry then asked, "Okay, would you voluntarily consent for a search for contraband, ma'am?" *Id*. With uncertainty in her voice, Castro-Gallegos said, "Um, okay, it's only my underwear." *Id*. At that point, Castro-Gallegos stood up and moved into the aisle, and Perry told her, "Sure, don't knock off your, the thing there," referring to the drink that was sitting on her folded-down tray table. Tr. at 23, 49. Then, Perry asked Castro-Gallegos, "Would it be okay if I set it up here?", referring to her bag and gesturing toward the empty aisle seat across from Castro-Gallegos' seat. Govt. Ex. 1; Tr. at 24. There is no audible response from Castro-Gallegos; at this point, her exchange with Perry is interrupted by another passenger trying to get by in the aisle. Govt. Ex. 1. However, according to Perry, he did not in fact lift up the bag. Instead, Castro-Gallegos picked up her bag and placed it in the seat where she had been sitting. Tr. at 24. She moved forward to the space in the aisle in front of her seat, while Perry moved back in the aisle to stand directly across from the seat she had occupied. Tr. at 23-24, 48-49; Govt. Ex. 10. Castro-Gallegos then opened her bag and began

moving things around inside, presumably in an attempt to show Perry that it contained nothing illegal. Tr. at 24. Perry said, "Okay, I see you moving stuff, would you give me permission to do a search, ma'am?" Govt. Ex. 1. Again, Castro-Gallegos demurred, responding, "Uh, it's my underclothes and . . ." *Id*. Perry said, "I understand, I won't mess anything up or anything like that, okay?" *Id*. Castro-Gallegos asks, "Can I just move my . . .?", presumably referring to some underwear in the bag. *Id*. In response, Perry says, "Sure, you can take your, if you want, tell you what if you want to put it underneath the blanket, if you don't want people to see it." *Id*. This is followed by an exchange between Perry with a male passenger, who is unable to get by in the aisle. *Id*. A moment later Perry asks Castro-Gallegos, "Do you want to put it underneath there [the blanket], ma'am?" *Id*. She responds, "Oh, yeah." *Id*. Perry says, "Okay, don't forget your wallet is right there." *Id*. Castro-Gallegos then places some items of underwear under a blanket on the seat. Tr. at 25, 52-53. Then, Perry says, "Okay, thank you." *Id*.; Tr. at 72. Perry testified that at about this point, Castro-Gallegos stepped back and gestured toward her bag with her arm outstretched, which Perry interpreted as nonverbal permission for him to search it. Tr. at 25, 52, 71-72. Perry searched the bag and could see that the bottom was raised eight to ten inches, with a compartment underneath. Tr. at 26-27. Perry felt numerous hard bundles inside the lining of the bottom. Tr. at 27. He saw a Velcro strip along the edge of the lining, Govt. Exs. 5-6, and opened it up. At this point, Perry found several bundles containing heroin and methamphetamine. Tr. at 29.

## DISCUSSION

As grounds for her motion to suppress, Castro-Gallegos makes three arguments. First, she contends that her encounter with Perry became an investigative detention or a seizure for which

he lacked reasonable suspicion or probable cause. Second, she argues that she never gave Perry consent to search her bag. Third, she argues that if such consent was given, it was involuntary.

## I.     Consensual Encounter or Investigative Detention/Seizure?

Castro-Gallegos argues that Perry escalated their meeting past the point of consensual encounter until it had become an investigative detention or a seizure. Doc. 26 at 7-9. She points to the "escalation" of the conversation from the initial questions about where she came from and her destination, to her luggage and what was in it, and posits that Perry lacked reasonable suspicion or probable cause to continue the encounter and make these inquiries. *Id.*

In *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000), the Tenth Circuit observed, "[t]he Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." "Consensual encounters are not seizures within the meaning of the Fourth Amendment and need not be supported by suspicion of criminal wrongdoing." *Id.* An investigative detention is "a seizure within the meaning of the Fourth Amendment but, unlike an arrest, it need not be supported by probable cause." *Id.*

It is well-established that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)) (internal quotation marks omitted). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [ ]he was not free to leave." *United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010) (first alteration in original) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)) (internal quotation marks omitted); *see, e.g., United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) ("A seizure occurs when 'a reasonable person would not feel free to leave or disregard the contact.' " (quoting *Lundstrom*

*v. Romero*, 616 F.3d 1108, 1119 (10th Cir. 2010))). "The critical inquiry is whether the police conduct would have communicated to a reasonable person that [ ]he was not at liberty to ignore the police presence and go about [his] business." *Fox*, 600 F.3d at 1258 (quoting *Bostick*, 501 U.S. at 437) (internal quotation marks omitted).

In *United States v. Rogers*, 556 F.3d 1130 (10th Cir. 2009), the Tenth Circuit stated that to determine whether an individual has been seized, once should consider several factors, including:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

556 F.3d at 1137-38. The Tenth Circuit has also considered whether an officer indicated to the person that he is free to leave. *See United States v. Ledesma*, 447 F.3d 1307, 1314-15 (10th Cir. 2006). However, no single factor is dispositive, and this list is not exhaustive. *Rogers*, 556 F.3d at 1138.

The inquiry is an objective one. *See United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003). "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir. 1992).

Here, Castro-Gallegos was met with only one officer, Perry. There is no evidence that he brandished a weapon at her, touched her, or used aggressive language or tone of voice. To the contrary, the recording of the encounter demonstrates that at all times Perry's tone was neutral, and sometimes friendly. Perry did not tell Castro-Gallegos that her compliance was compulsory, nor did he retain her personal effects for any period of time. The encounter took place in a public, albeit cramped, space with other people nearby. However, at no point did Perry inform Castro-Gallegos that she was free to leave or that she had the right to refuse consent to search her bag. Tr. at 54. Although

7

Castro-Gallegos testified that Perry stood in the aisle and loomed over her seat, making her feel as though she must slide over to the empty window seat and effectively blocking her exit from the train, Tr. at 75-78, the Court does not find her testimony on this point to be credible. Rather, on this point the Court credits the testimony of Perry, who testified that he stood first in front of the empty seat in front of Castro-Gallegos, and then later, after she stood up, he stood in the aisle next to the seat she had vacated. Tr. at 23-24, 48-49; Govt. Ex. 10.

Based on all of the foregoing, the Court concludes that this encounter remained consensual, and therefore there was no need for Perry to acquire reasonable suspicion or probable cause to continue to talk with Castro-Gallegos.

## II.     Validity of Consent to Search

Castro-Gallegos contends that she did not give Perry valid consent to search her bag. Citing cases holding that consent must be unequivocal and specific, Castro-Gallegos argues that she never said or did anything unequivocally granting Perry consent to search. She points out that she never said "yes" or "okay," or made any other utterance that can be interpreted in the affirmative when Perry asked for her consent. She also contends that when Perry asked to search the bag, she protested by indicating that she did not want him to go through her underwear. Castro-Gallegos argues that the gesture she made with her arm was not one of consent, but rather a gesture intended to show Perry that there was no contraband in the bag after she took out the underwear, as well as an indication of her exasperation with him for requiring her to pull out her underwear in a public area. In response, the Government argues that in extending her arm toward the bag after removing her underwear, Castro-Gallegos gave Perry implied consent to search. The Government does not argue that Castro-Gallegos explicitly told Perry, "Yes, you can search my bag," or that she ever said or nodded "yes" in response to his direct request for permission to search.

Searches conducted pursuant to valid consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). For consent to be voluntary, the government must receive either express or implied consent. *See United States v. Jones*, 701 F.3d 1300, 1320-21 (10th Cir. 2012). The government bears the burden of proving, by a preponderance of the evidence, that Perry obtained Castro-Gallegos' *unequivocal and specific* consent before he searched her bag. *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (requiring "clear and positive testimony that consent was unequivocal and specific").

Implied consent is no less valid than explicit consent. *See Jones*, 701 F.3d at 1320-21. Consent "must be clear but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *United States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007). "The focus is not whether [one] subjectively consented, but rather, whether a reasonable officer would believe consent was given" as "inferred from words, gestures, or other conduct." *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009). However, whether consent is implied or express, it cannot be "coerced, by explicit or implicit means, by implied threat or covert force" and "is voluntary if there is no indication of either force or intimidation." *United States v. Kimoana*, 383 F.3d 1215, 1225 (10th Cir. 2004) (internal quotation marks omitted).

After weighing the testimony and the exhibits admitted at the hearing, the Court concludes that the Government did not meet its burden to prove through "clear and positive testimony" that Castro-Gallegos gave Perry unequivocal implied consent to search her bag. What the evidence did reveal was that Perry twice asked Castro-Gallegos for consent to search her bag, and both times she withheld that consent. The first time Perry asked, Castro-Gallegos responded, "Um, okay, it's only my

underwear." Her statement is far from a clear grant of consent, and in fact, one can infer from Castro-Gallegos' subsequent behavior that she denied the request. That is, she did not allow Perry to search the bag, but rather tried to show him its contents without permitting him access to the bag itself. Comprehending that he had not been granted permission, Perry made a second request: "Okay, I see you moving stuff, would you give me permission to do a search, ma'am?" And again, Castro-Gallegos hesitated, responding, "Uh, it's my underclothes and . . ." In a second attempt to show him the contents of the bag without permitting him to search it, Castro-Gallegos removed items of underwear from her bag, hiding them under a blanket in the seat next to the bag. It was at this point that Castro-Gallegos extended her right arm out toward the bag in a non-verbal gesture the Government construes as consent.

The question before the Court is whether, given the context of their encounter, a reasonable officer would believe that Castro-Gallegos had given consent as "inferred from words, gestures, or other conduct." Here, the Court concludes that the Government has not made that showing. Castro-Gallegos had twice declined to give Perry consent to search the bag, and had twice attempted to put off his request by trying to show him the contents without giving him access to the bag itself. On the current record, a reasonable officer may well have inferred from Castro-Gallegos' outstretched arm that he was being shown that it contained only the underwear she removed, or perhaps that her gesture was an indication of her exasperation with him for requiring her to pull out her underwear in a public area. The evidence in the record does not show that Castro-Gallegos gave consent that, though non-verbal, was unequivocal and specific. As a result, the Court concludes that Perry searched Castro-Gallegos' bag without valid consent. Accordingly, the motion to suppress will be granted.

III.    **Voluntariness of Consent**

Defendant argues that even if she gave implied consent, it was not freely given because Perry pressured her to remove and display her underwear in public despite her initial reluctance, and that this is an indication of intimidation and pressure. Further, she points out that Perry did not inform Defendant of her right to refuse the search. Defendant relies heavily on this point, arguing that because she is an illegal alien from a country where there is no right to refuse a police officer, she had no knowledge of her right to walk away or refuse consent. However, having found that the Government failed to meet its burden to show that Castro-Gallegos gave Perry either express or implied consent to search, the Court need not reach the question of voluntariness.

**IT IS THEREFORE ORDERED** that the *Motion to Suppress Evidence* [Doc. 26] by Defendant Bethzabeth Guadalupe Castro-Gallegos is hereby **GRANTED**.

_____

**UNITED STATES DISTRICT JUDGE**